**Edward S. PANTZER, Plaintiff,**

v.

**SHIELDS DEVELOPMENT COMPANY, Defendant.**

**Civ. A. No. 85–449–JRR.**

United States District Court, D. Delaware.

Nov. 7, 1986.

---

**4.** The relevant inquiry is how a Connecticut court would construe the statute. *See Mikulis*, n. 1.

Edward M. McNally of Morris, James, Hitchens & Williams, Wilmington, Del., for plaintiff.

Peter J. Walsh of Bayard, Handelman & Murdoch, Wilmington, Del., for defendant.

ROTH, District Judge.

This is a suit for breach of contract in which the plaintiff, Edward S. Pantzer, alleges that the defendant, Shields Development Company, backed out of an agreement to sell Shields Suburban Shoppes to Pantzer and instead sold the shopping center to a third party, Edward DeSeta. The contract that Pantzer alleges existed was not a formal sales agreement, but rather consisted of a number of letters and memoranda exchanged between October, 1984 and April, 1985. The plaintiff's position is that this correspondence contains all the elements necessary to satisfy the Statute of Frauds and bind the parties; the defendant asserts that the letters constitute mere negotiation.

Defendant Shields Development Company has filed a motion for summary judgment, arguing that the Statute of Frauds bars any agreement and that the negotiations did not, as a matter of law, amount to a binding agreement. Pantzer responds that the defendant's failure to plead the Statute of Frauds in its answer waives that affirmative defense, and that there are genuine issues of material fact that prohibit a summary judgment.

Federal Rule of Civil Procedure 56(c) provides that a judgment shall be entered if the pleadings and record show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. In reaching this determination, the burden is on the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The proper test is whether the non-moving party can show any facts that would entitle him to the relief sought. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In making its decision, the Court must consider all the factual allegations and reasonable inferences in the light most favorable to the non-moving party. *Sheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

## I. Background.

Shields Development Company (Shields) was owned at all relevant times by the Shields family. Daniel Shields and his brother John Shields each owned roughly 47% of the business, and the remainder was owned by their step-mother, Virginia Shields. Daniel and John also owned 51% and 49%, respectively, of Shields Lumber & Coal Company (Shields Lumber), located in Shields Suburban Shoppes shopping center. In May, 1984, Daniel and Virginia Shields came to the conclusion that the business should be dissolved and the shopping cen-

ter sold. The marketing of the property was handled entirely by Daniel Shields, through his attorney, Peter Walsh.

On October 18, 1984, after the shopping center had been on the market for several months, Walsh received a letter from Jack Stoltz, who on behalf of Edward Pantzer made an offer of $4 million.[1] Pantzer, through Stoltz, agreed to post a $40,000 good faith deposit and suggested a thirty day "due diligence period," during which Pantzer would review books and records concerning the shopping center's income and expenses and conduct engineering studies. The letter stated that the sale would be subject to the parties entering into a mutually agreeable lease for Shields Lumber, which the Shields family would continue to operate. Finally, the letter included a provision that the deposit would be returned if Pantzer's due diligence investigation was unsatisfactory and if a mutually acceptable Agreement of Sale was not executed.

Walsh responded in a letter dated October 24, asking $4.25 million and requesting more specifics on the lease. Walsh apparently knew by October 23 that Pantzer would agree to the higher price, because on that day he wrote to John Shields offering to sell out Daniel Shields' interest based on a value of $4.25 million. John Shields rejected this offer. Pantzer wrote to Walsh on October 31, offering the higher price and asking for a "letter of intent." On November 7, Walsh sent Pantzer a letter stating:

> On behalf of Shields Development Company, this letter will constitute a letter of intent with respect to your purchase of the Greenville Shopping Center [sic].
>
> The terms are as set forth in the Stoltz Realty October 18, 1984 letter to me, as amended by your October 31, 1984 letter to me and subject to the following modification.... [W]e agree that during the due diligence period we will not negotiate for the sale of the property to any other

party. However, since we have communicated with quite a few potential buyers regarding this property, we anticipate receiving, and will not discourage, the submission of proposals. However, we will not pursue those proposals during the due diligence period.

Pantzer signed this "letter of intent" on November 15 and returned it to Walsh. The due diligence period commenced on November 15 and was extended to December 24. On December 21, Pantzer's attorney sent Walsh a "proposed Agreement" which reflected the terms in the letter of intent but did not describe any terms for the lease of Shields Lumber.

On January 4, 1985 Walsh sent Pantzer's attorney a letter suggesting some terms for the lease. The parties met on January 17 to discuss the sale. At that meeting, Pantzer disclosed that he intended to build an office building on the back lot of the shopping center, and that he planned to use an Industrial Revenue Bond (IRB) to finance the entire deal. Pantzer also asked Walsh to lower the price. Walsh responded by asking for a higher deposit. They also discussed lease terms, but nothing was resolved. In a January 22 letter to Walsh, Pantzer explained that he needed the IRB financing because a cash deal would not work. The parties again met on January 25 and discussed the price, the deposit, and the idea (but not the specific terms) of using IRB financing, once more with no results.

By February 13, however, the parties had reached agreement on the price, $4.085 million, the amount of the deposit, $100,000, the terms of the lease, and the use of IRB financing. In a February 8 letter to his brother, Daniel Shields described these aspects of the deal, and gave him an opportunity to buy out Shields Lumber, or to match Pantzer's offer for the shopping center. In a February 11 inter-office memo, Paul Jaffe, one of Pantzer's attorneys, described the terms of the proposed IRB fi-

---

1. For purposes of this opinion, the negotiations between Pantzer and Shields will be divided into two periods. The first period covers from October 18 through December. The second period includes January through April 1985.

nancing to another of Pantzer's attorneys, Allan Schneirov.

According to this memo, the agreement was to be conditioned upon Pantzer being able to obtain an IRB mortgage "in a minimum amount of $10,000,000 floating at 75% of prime, 15 year term, no recourse, and subject to transferability." The memo indicated that Pantzer had worked out this deal with the "owners" of the shopping center, that Pantzer wanted Schneirov to contact Walsh and review the IRB financing and the terms of the Shields Lumber Lease with him, "provided that you not volunteer this information but see whether Walsh has received this information from his client before you confirm it." On February 13, Schneirov confirmed every part of the deal with Walsh except for the terms of the IRB financing. Walsh followed up this conversation with a letter on February 20 that stated that they had agreed to all substantive terms of the sale. Schneirov then sent a second draft of the formal Agreement of Sale, which this time included the terms of the lease and of the IRB. In his deposition, Walsh stated that this was the first time he had seen the terms of the proposed IRB, although Pantzer suggests that he, in fact, was aware of them earlier.

Walsh rejected the IRB terms contained in the proposed Agreement of Sale as unrealistic. On March 13 Walsh spoke with Pantzer's banker in New York, who characterized the terms as "within the realm of possibility." Walsh was apparently unconvinced, however, and Pantzer's proposed IRB terms remained the main area of disagreement between the parties.

Walsh had set a deadline for negotiations of March 15, but by that date no progress had been made on the IRB terms. Schneirov sent Walsh a "side bar" letter on March 15, which offered to "soften" the financing terms as between Pantzer and Shields, while retaining the previously suggested terms as between Pantzer and his lending bank.

On March 18, Shields received an offer of $4.18 million from Edward DeSeta for the shopping center. This oral offer was con-

firmed by letter on March 22, and a draft contract followed on March 26. The next day DeSeta met with Walsh to confirm the terms of the deal, which involved no financing. Shields gave Pantzer an opportunity to match the DeSeta offer before finalizing the deal with DeSeta. Pantzer agreed to meet DeSeta's price, but remained firm on the need for IRB financing. On April 3 Shields executed a formal Sales Agreement with DeSeta. Closing was on August 15, 1985.

## II. The November "Letter of Intent."

We will first take up the exchange of letters that occurred in October and November, 1984. Pantzer's position is that these letters constitute not only a sufficient writing to satisfy the Delaware Statute of Frauds, but also a binding contract for the sale of the shopping center. Shields responds that the letters are merely negotiations. Because we find that the letters, as a matter of law, could not constitute a complete agreement, we will grant summary judgment on this aspect of the case without addressing the Statute of Frauds question.

Several facts are clear from the face of the letters exchanged in October and November, 1984. First, the letters are designated "letter of intent" rather than a contract. Secondly, they anticipate a subsequent formal agreement of sale that was never executed. Third, the deal described in the letters was expressly "subject to the Buyer and Seller entering into a mutually acceptable lease," the terms of which were not agreed upon until February, 1985. Fourth, both parties knew that Shields considered the lease terms to be "an integral part of the sale of the real estate." Taken together, these facts demonstrate that the letters could not be a binding contract because they lack an essential term.

While missing terms do not always negate the existence of a contract, it is well settled that there can be no contract when an *essential* term is missing. Professor Corbin has stated:

As long as the parties know that there is an essential term not yet agreed on, there is no contract.... Even though one of the parties may believe that the negotiation has been concluded, all items agreed upon, and the contract closed, there is still no contract unless he is reasonable in his belief and the other party ought to have known that he would so believe.

1 *A. Corbin, Corbin on Contracts*, § 29 at 82–83 (1963); *see also Restatement (2d) of Contracts*, § 27 comment b.

The question of what is an essential term is often a question of fact involving a determination of each party's intent to be bound, and thus must frequently be decided by a jury. *See, e.g., Corbin*, § 30, at 97; *Caisson Corp. v. Ingersoll-Rand Co.*, 622 F.2d 672, 678 (3d Cir.1980); *Universal Products Co., Inc. v. Emerson*, 179 A. 387, 394 (Del.1935). However, in this case, there can be no doubt that the lease terms were essential to the completion of the deal. *See, e.g., Dumas v. First Federal Savings & Loan Ass'n*, 654 F.2d 359, 361 (5th Cir.1981). Shields indicated as much in the letter of October 24, and Pantzer's original proposal made the sale contingent on reaching an agreement on the lease. In addition, later negotiations over the lease terms led Pantzer to request a lower price and change the financing-aspects of the deal that previously had been settled. If Pantzer did, in fact, believe that the contract was binding without the lease, that belief was not reasonable under these facts. Clearly, the lease terms were as essential to the deal as the price, the deposit, and the method of financing. We find that a jury could not, on these facts, conclude that there was a binding contract based on the letter of intent.

The letter of intent operated more as an option contract than anything else. *See Restatement (2d) of Contracts*, § 25. Although the letters exchanged contained certain terms of the sale itself, it also designated a thirty day "due diligence period," during which Shields agreed to refrain from accepting or pursuing other offers. The thrust of this appears to be that Pantzer could take 30 days to consider the deal and examine the property without fear of losing the property to another buyer. He had, in a sense, an option on the property at the terms stated. *See Corbin*, §§ 259, 273. Pantzer, in fact, argues that Shields was bound by the terms of the letter of intent while Pantzer himself was not. This one-sided obligation, while inconsistent with any contract for the sale of property, is exactly the result of an option. At the end of the due diligence period, Pantzer sent to Walsh a "proposed Agreement," which was no more than that—a proposal under which the negotiations continued.

### III. The Negotiations from January Through April 1985.

Having concluded that no contract existed by the end of 1984, we will now consider the negotiations as they continued through April 1985. The defendant again contends that the parties merely continued negotiation, and were never bound, and that no writing sufficient to satisfy the Statute of Frauds was created. The plaintiff again responds that defendant failed to plead the Statute of Frauds in its answer, thus waiving the affirmative defense and that there are genuine issues of material fact that preclude summary judgment. While we will permit the defendant to raise the Statute of Frauds defense, we agree with the plaintiff that issues of material fact remain, and we, therefore, deny the motion for summary judgment on the remainder of the case.

### A. Pleading the Statute of Frauds.

Although Shields raises the affirmative defense of the Statute of Frauds, it failed to plead it in its answer. Pantzer argues that this failure constitutes a waiver of the defense, since Rule 8(c) of the Federal Rules of Civil Procedure requires that all affirmative defenses be pleaded in the defendant's answer. *Moore's Federal Practice* points out, however, that "there is a split in authority as to whether a defendant may, subsequent to filing an answer, move for summary judgment on the basis of an affirmative defense omitted from the answer." 2A *J. Moore & J. Lucas, Moore's*

*Federal Practice,* § 8.28, at 8–206 to 8–207 (1986). Cases that have allowed an affirmative defense to be raised in a summary judgment motion have done so where no prejudice to the non-moving party results. *Moore's* concludes that this approach "is more in keeping with the general purpose of the Federal Rules to avoid decisions based on pleading technicalities rather than the merits of the case." *Id.* at 8–207 to 8–208. Where there is no genuine issue of material fact regarding the affirmative defense, *Moore's* indicates that the summary judgment is proper even when the defense was not originally pleaded. *Id.,* § 56.02[2], at 56–27; *id.,* § 56.17[4], at 56–737.

The Third Circuit has considered the question of failure to plead an affirmative defense only in situations where the defense is raised for the first time on appeal. Judge Gibbons held that the appellee could not raise the Statute of Frauds for the first time on appeal to support a directed verdict in a case where the record did not clearly support the claim. *United McGill Corp. v. Gerngross Corp.,* 689 F.2d 52, 54 (3d Cir. 1982). However, in a later case, involving an affirmative defense that was not pled in the district court, Judge Gibbons ruled that it was available to be considered in the appeal when the facts underlying the defense have been pleaded and the issues of the defense were, in fact, tried. *Prinz v. Greate Bay Casino Corp.,* 705 F.2d 692, 694 (3d Cir.1983).

■ In the present case, we are dealing with an affirmative defense which is raised not post-trial but pre-trial. As Judge Gibbons stated in *United McGill Corp.:*

> Federal Rule of Civil Procedure 8(c) requires that a defense such as statute of frauds be pleaded affirmatively to give fair notice to the plaintiff and the trial court.

689 F.2d at 54. Plaintiff here has, in fact, received fair notice of the Statute of Frauds defense. He has responded to this issue in his Answering Brief. There is, therefore, no prejudice to him if we address the issue now along with the overall motion for summary judgment. Therefore, we will deem the defendant's answer amended to include the affirmative defense of the Statute of Frauds.

### B. Sufficiency of the Writing Under the Statute of Frauds.

Delaware's Statute of Frauds, codified at 6 *Del.C.* § 2714, requires that contracts for the sale of land be "reduced to writing, or some memorandum or notes thereof," and that the writing be signed by the person to be charged. This Court has held that under section 2714 the memorandum "need not be in one writing, but may consist of several writings, only one of which need be signed." *Abramson v. Delrose, Inc.,* 132 F.Supp. 440, 442 (D.Del.1955). Judge Rodney went on to state that the writing need not be made with the specific intent of satisfying the Statute of Frauds. On the other hand, it is generally recognized that the writing must state the essential terms of the contract, and identify the subject matter and parties to the contract. *Restatement (2d) of Contracts,* § 131. Comment g to section 131 states that whether a given term is essential to the contract "depends on the agreement and its context and also on the subsequent conduct of the parties."

An examination of the record shows that, if we view the facts in the light most favorable to plaintiff, all of the essential elements involved in the deal had been recorded in written memoranda. On February 26, Pantzer's attorney, Schneirov, sent a proposed Agreement of Sale to Walsh which contained the subject matter, the parties, and all of the terms that had been consented to by the parties up to that point. It also described financing terms under the proposed IRB. If those financing terms had, in fact, been agreed upon, this is reflected in the writing.

■ The only requirement for a sufficient writing that is not clearly met is that the party to be charged must have signed one memorandum describing the contract. Although the record contains a letter from Daniel Shields to his brother that describes the price and the terms of the lease, the copy of this letter in the record is a carbon and does not show a signature. We will not, however, suppose at this time that it was never signed, and we will not, there-

fore, grant defendant's motion on the grounds that the Statute of Frauds was not satisfied.

### C. Existence of a Binding Contract.

Apart from the question of the sufficiency of the writings involved, the central question in this litigation is whether the parties actually formed a binding contract. This question focuses down to three issues: (1) whether the terms of the IRB were essential to the deal (as the lease was to the earlier negotiations); (2) whether Shields did or reasonably should have accepted the terms of the IRB; and (3) whether the parties intended to be bound.

■ Taking the facts in a light most favorable to the plaintiff, we find that a jury could find in the plaintiff's favor on any or all of these issues. With regard to whether the IRB terms were essential, a jury could find that they were considered to be mere details by the parties, based on statements made by both parties during the negotiations. Walsh stated, for example, that all substantive terms had been agreed to, before he claims he first learned of the IRB terms. We also find that a jury could determine that Walsh knew about the IRB terms before he made that statement. From this a jury could infer that he had agreed to the IRB terms. Finally, we find that there is evidence from which a jury could conclude that Shields intended to be bound by the terms agreed upon before signing a formal agreement.

We are not concerned with the strength of the evidence other than to conclude that a jury could find in the plaintiff's favor—or in favor of the defendant. Because these issues of fact require resolution by a jury, we will deny defendant's motion for summary judgment based on its contention that the parties had not formed a binding contract in the January through April 1985 negotiations.

### D. Acting in Good Faith.

Pantzer's complaint alleges that by negotiating with Pantzer and then ultimately signing a contract with a third party, Shields did not act in good faith. Shields has also moved for summary judgment on this issue.

Pantzer's argument is not clear as to whether he is asserting that the duty of good faith arises during negotiations or only upon the formation of a contract. We can find no authority for the proposition that a duty to act in good faith arises during negotiations, unless there is a specific agreement to negotiate in good faith. We will construe this argument to assert a duty of good faith after a contract is formed, for which proposition there is authority.

Professor Corbin has stated that all contracts impose a constructive condition on the parties to act in good faith in carrying out their contractual obligations. *See Corbin on Contracts*, § 654A, at 793–96 (Kaufmann Supp.1984); *see also Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974); *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), *cert. den.* 415 U.S. 920, 94 S.Ct. 1421, 39 L.Ed.2d 475 (1974).

In order to show a breach of this duty, however, Pantzer has to show that there was, in fact, a contract—a question which we have ruled must be decided by a jury. Because this issue must go to the jury, we will reserve until then the question of whether plaintiff has made an adequate showing that the contract included an obligation to negotiate in good faith on unresolved terms, such as IRB financing.