**AUBREY ROGERS AGENCY, INC., Plaintiff,**

v.

**AIG LIFE INSURANCE COMPANY, Defendant.**

No. CIV. A. 97–529 MMS.

United States District Court, D. Delaware.

June 9, 1999.

Jeffrey C. Wisler, Williams, Hershman & Wisler, P.A., Wilmington, DE of Counsel, Jeffrey H. Marsh, Karl R. Schneider, Mattingly & Marsh, L.L.P., Houston, TX, for plaintiff.

Stephen E. Jenkins, Regina A. Iorii, of Ashby & Geddes, Wilmington, DE, for defendant.

## OPINION

SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Plaintiff Aubrey Rogers Agency, Inc. ("Aubrey") sold credit life insurance and disability policies underwritten by defendant American International Group ("AIG"). In February 1995, AIG unilaterally terminated its relationship with Aubrey. Shortly thereafter, AIG exited the credit life insurance and disability business due to heavy losses.

This litigation stems from AIG's decision to terminate its relationship with Aubrey. Both AIG and Aubrey have filed cross motions for partial summary judgment. In addition, AIG has filed a motion, pursuant to Federal Rules of Civil Procedure 36(b), to have its responses to Aubrey's request for admissions deemed timely.

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. For reasons that follow, (i) AIG's motion to have its responses to Aubrey's request for admissions deemed timely will be granted; (ii) AIG's answer will be deemed amended to include the affirmative defense of the Statute of Frauds; (iii) AIG's motion for partial summary judgment will be granted in part and denied in part; and (iv) Aubrey's motion for partial summary judgment will be granted in part and denied in part.

## II. FACTS

AIG is an international insurance company, engaged in underwriting and selling insurance, including credit life and disability insurance. Plaintiff Aubrey is an independent insurance agency that among other things, acts as a managing general agent ("MGA") for a number of insurance companies, including AIG, that write credit life and disability insurance. Credit life and disability insurance, which pays off a loan in case of the purchaser's death or disability, is most commonly purchased by people who are buying an automobile on credit or who are taking out a bank loan. As an MGA, Aubrey is responsible for recruiting other insurance agents, who in turn recruit automobile dealers and banks (collectively "accounts") that actually sell the insurance to consumers. Aubrey receives a commission override for each policy that the insurance agents and accounts sell. Aubrey Rogers ("Rogers") is the president of the Aubrey Rogers Agency, Inc.

Sometime in late 1992 or early 1993, AIG made a decision to expand its credit life and disability insurance business. On April 15, 1993, AIG and Aubrey entered into an Agent Agreement, whereby Aubrey agreed to sell AIG credit life and disability insurance in Ohio and South Car-

olina. Shortly thereafter, the parties expanded their relationship to cover other states, including West Virginia. Their new relationship was in the form of an oral agreement. The oral agreement called for Aubrey to receive an aggregate commission of 57% on credit life insurance and 50% on disability insurance. The parties dispute whether AIG was required to provide Aubrey with monthly experience reports.[1] On July 15, 1994, AIG sent Rogers a proposed Agency and Administration Agreement (the "Agreement"), which covered the states of Florida, Virginia and West Virginia, and sought to memorialize their earlier oral agreement.

Rogers had certain reservations about the Agreement and proposed in its place a revised agreement, which addressed his concerns. Joseph Pagano ("Pagano"), AIG's account manager for Aubrey's business, suggested to Rogers that he sign the Agreement, as it was unlikely that AIG would agree to Rogers' revised agreement. What happened after this is unclear. There is a dispute between the parties as to whether Rogers ever signed the Agreement and returned it to AIG, and, if returned, AIG signed it. AIG states that it has been unable to locate a copy of the signed Agreement in its files. Rogers has submitted a copy of the Agreement, dated October 3, 1994, which bears his signature but not AIG's. Docket Item ("D.I.") 130 at A172. The parties have been unable to locate a copy of the Agreement that has affixed to it both signatures.

During 1994, Aubrey's business with AIG increased dramatically. In 1993, Aubrey's accounts produced about $574,000 in premiums for AIG, while in 1994 they wrote premiums in excess of 6.5 million dollars. In late 1994, AIG actuaries determined the credit life insurance unit was unprofitable because the actual loss ratio on the policies was greater than projected. AIG sought to remedy this by decreasing the commission rate it paid out to its credit life insurance MGA's from 57% to 35% effective, January 1, 1995. D.I. 130 at A158.

The new commission structure was not acceptable to Rogers. He knew he would be unable to retain his existing agents if he paid them at the new AIG commission rate because the competition was offering significantly higher commission payments. Aubrey attempted to move its credit life insurance business to other insurers, but was not entirely successful in doing so. In a December 21, 1994, letter to Jeffrey Capone ("Capone"), the head of AIG's credit life insurance unit, Rogers advised that Aubrey was able to move only 50% of its West Virginia accounts to other insurers. D.I. 130 at A187. The rest was presumptively lost. On February 1, 1995, AIG sent Aubrey a letter terminating their relationship, effective March 5, 1995. D.I. 130 at A159. Shortly thereafter, AIG withdrew from the credit life insurance business and took a 15 million dollar write off.

### III. STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, the court should grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the out-

---

1. What "experience reports" entail is best illustrated by Rogers testimony:

 "It gives you the quantitative information needed to determine whether the business is profitable or not, it gives you total premiums written, the net premiums after cancellations, gives you the earned premiums, the unearned premiums, gives you the paid claims, gives you the incurred claims. With that information, even though the computer already does this for you, you can go and look at the summary by period for the entire block of business and you can take and break it down by account and determine which accounts are causing loss problems for you. Accordingly, you have the advantage of knowing the accounts that are bad, and you can cancel those accounts and greatly enhance the profitability of the business."

 Docket Item ("D.I.") 137, Exh. A at 104/1.

come of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party. *See id.* When considering a motion for summary judgment, the court must "view all facts and inferences in the light most favorable to the party opposing the motion." *Stephens v. Kerrigan*, 122 F.3d 171, 176–177 (3d Cir.1997). The Supreme Court has clarified that the moving party must "bear the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, demonstrate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. The nonmoving party cannot rest on its allegations without "any significant probative evidence tending to support the complaint." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). *See also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989) (stating that a non-moving party must "adduce more than a scintilla of evidence in its favor . . . and cannot simply reassert factually unsupported allegations contained in its pleadings").

## IV. DISCUSSION

Both parties' motions basically address four issues, (i) does the October 3, 1994, Agreement violate the Delaware Statute of Frauds; (ii) did AIG tortiously interfere with the contractual and business relations that Aubrey had with its subagents; (iii) did AIG breach an oral agreement to provide Aubrey with monthly experience reports; and (iv) did AIG either fraudulently or negligently misrepresent to Aubrey that it would provide Aubrey with monthly experience reports and aggressively seek from West Virginia a rate deviation on the disability policies. The Court will address each issue in turn.

### A. Statute of Frauds

In order to determine whether the Agreement violates the Statute of Frauds, the Court will have to address both procedural and substantive objections raised by the parties. The Court will first address the two procedural issues. AIG seeks to have its responses to Aubrey's request for admissions deemed timely filed, pursuant to Federal Rules of Civil Procedure 36(b). In turn, Aubrey asks this Court to hold that AIG has waived the Statute of Frauds defense due to its failure to assert the Statute of Frauds as an affirmative defense in its answer.

### 1. AIG's Responses To Aubrey's Request For Admissions

Aubrey originally filed this lawsuit in a Texas state court. AIG removed the action to the United States District Court for the Southern District of Texas, and subsequently moved to transfer venue to the District of Delaware. On February 28, 1997, while the case was still pending before the District Court for the Southern District of Texas, but after AIG had moved to transfer venue, Aubrey served its first set of interrogatories and request for admissions on AIG. Subsequently Aubrey agreed to extend the deadline for the responses to May 1997. In September 1997, the case was ordered transferred to the District of Delaware. On January 14, 1998, eight months after expiration of the extension period granted by Aubrey, AIG filed its responses to Aubrey's request for admissions including a denial of the existence of the Agreement. Aubrey argues

the AIG responses were untimely and therefore, the requests for admissions should be deemed admitted. Aubrey asserts it would be prejudiced if the Court were to allow AIG to withdraw its deemed admission.

Rule 36(b) of the Federal Rules of Civil Procedure provides that a matter admitted under this rule is conclusively established "unless the court on motion permits withdrawal or amendment of the admission." Fed.R.Civ.P. 36(b). The Rule further provides that "the court may permit withdrawal or amendment when the presentation of the merits of the action will be subserved thereby and that the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits." *Id.*

█ Aubrey is not prejudiced by the withdrawal of AIG's admissions. Moreover, the merits of the action will be subserved, if the Court were to allow AIG to withdraw its admissions. AIG's responses, including its denial of the existence of the Agreement, were filed on January 14, 1998, a date before any significant discovery was conducted in the case. The first deposition was taken on March 13, 1998, almost two months after AIG's response denying the existence of the Agreement. Aubrey asserts it would be prejudiced because it relied on AIG's response, as to the existence of the Agreement, being deemed admitted when it prepared its reply brief to AIG's motion for partial summary judgment. AIG's opening brief for partial summary judgment was filed with this Court on September 30, 1998, almost ten months after AIG denied the existence of the Agreement. Surely, Aubrey knew or should have known that AIG was denying the existence of the Agreement when it prepared its reply brief. Aubrey's assertion is further weakened by the fact its own opening brief for partial summary judgment, filed on the same date as AIG's opening brief, does not rely on the existence of the Agreement.

Moreover, Aubrey's case for partial summary judgment is strengthened if the Agreement is not admitted into evidence.[2] In addition, the merits of the action will be subserved because there is no copy of the Agreement that bears both parties' signatures. The only copy of the Agreement that exists is the one produced from Rogers file which only bears his signature. D.I. 130 at A172.

Aubrey's reliance on *United States v. Golden Acres*, 684 F.Supp. 96 (D.Del.1988), is misplaced. In *Golden Acres*, the court refused to allow the defendant to withdraw deemed admissions because (i) the plaintiff had relied on the deemed admissions in its opening and reply briefs in support of its motion for summary judgment; and (ii) the defendants did not seek to withdraw the admissions until eleven days before trial. *Id.* at 97–98. The Court stated that "to permit withdrawal of the deemed admissions on the eve of the trial would unfairly disrupt the government's preparations for trial and orderly procedures of this court." *Id.* at 99. *Golden Acres* is clearly distinguishable from the case at the bar. AIG denied the existence of the Agreement, before significant discovery had taken place, and ten months before the parties filed their opening briefs for partial summary judgment. Moreover, this Court has not yet set a trial date. *See also, Coca–Cola Bottling Co. of Shreveport, Inc. v. The Coca–Cola Company,* 123 F.R.D. 97, 102 (D.Del.1988) (the court denied defendant's motion to withdraw its deemed admissions, in part, because the discovery deadline had expired).

### 2. Waiver of Statute of Frauds Defense

AIG failed to assert Statute of Frauds as an affirmative defense in its answer,

**2.** The Agreement contains an integration clause. This would result in the Agreement superseding all prior oral agreements between the parties, including the oral agreement which calls for Aubrey to be provided with monthly experience reports and on which Aubrey's motion for partial summary judgment rests.

which it served on Aubrey in October 1996. Aubrey argues that this failure constitutes a waiver of the defense, because Rule 8(c) of the Federal Rules of Civil Procedure requires that all affirmative defenses be pleaded in the defendant's answer. Courts, however, have allowed an affirmative defense to be raised for the first time in a post-answer motion for summary judgment in instances where no prejudice to the non-moving party results. *See Smith v. Sushka,* 117 F.3d 965, 969 (6th Cir.1997) (defendant permitted to raise collateral estoppel defense on motion for summary judgment when there is no surprise or unfair prejudice to the plaintiff); *Dennis v. General Imaging,* Inc., 918 F.2d 496, 499–500 (5th Cir.1990) (defendant could assert an affirmative defense not set forth in its answer in a motion for summary judgment as there is no "unfair surprise" to the plaintiff); *Pantzer v. Shields Development Co.,* 660 F.Supp. 56 (D.Del. 1986) (defendant could assert an affirmative defense of Statute of Frauds in a motion for summary judgment, since there was no prejudice to the plaintiff who had responded to the issue in his answering brief).

■ As in *Pantzer,* Aubrey responded to the Statute of Frauds defense in its answering brief. Moreover, Aubrey received fair notice of the Statute of Frauds defense because AIG had denied the existence of the Agreement on January 14, 1998, ten months before it had filed its opening brief. Aubrey knew or should have known that AIG would assert a Statute of Frauds defense because not a single copy of the Agreement existed that had affixed to it both parties' signatures. Discovery was still open when AIG denied the existence of the Agreement. Aubrey had ample opportunity to conduct discovery on this issue and question witnesses regarding the existence of the Agreement.

There being no prejudice, the Court will deem AIG's answer amended to include the affirmative defense of the Statute of Frauds. Accordingly, the motions for partial summary judgment will be determined on the basis of AIG denying the existence of the Agreement.

### 3. Does The Agreement Violate The Delaware Statute of Frauds

The Delaware Statute of Frauds, 6 Del.C. § 2714(a), provides in pertinent part:

> No action shall be brought to charge any person ... upon any agreement that is not to be performed within the space of one year from the making thereof, ... unless the contract is reduced to writing, or some memorandum, or notes thereof, are signed by the party to be charged therewith, or some other person thereunto by him lawfully authorizing in writing ....

■ In order for the Statute of Frauds to apply, the Agreement between AIG and Aubrey must be incapable of being performed within the space of a year. Aubrey asserts the Agreement is capable of being performed within one year because the Agreement provides that either party could terminate it if (i) the other party breached the Agreement; (ii) a party ceased to operate as a business entity; or (iii) a party became insolvent, bankrupt or had its license to act as an insurance carrier suspended or revoked. Aubrey does not provide any authority to support its assertion that the existence of these contingency conditions in the Agreement transforms an Agreement with a duration of three years into an Agreement capable of being performed within a year. On the contrary, these conditions are in the form of standard cancellation provisions that allow parties to terminate a contract without being held liable if certain specified contingencies were to occur. If the Court were to adopt Aubrey's reasoning, virtually every contract or agreement between two sophisticated parties would be capable of being performed within a year. The Court declines to do so.

Finally, the Agreement expressly states that it cannot be terminated by either

party for a period of three years, except if certain conditions enumerated above were to occur. The conclusion is inescapable that the parties contemplated the Agreement being performed in a time period exceeding one year. Accordingly, the Agreement, not having been signed by AIG, is not enforceable by reason of the Delaware Statute of Frauds.

### 4. Part Performance

■ Not daunted, Aubrey also argues AIG's part performance under the terms of the Agreement removed the Agreement from the Statute of Frauds and estops AIG from denying the existence of the contract. Part performance is a recognized exception to the Statute of Frauds. *Quillen v. Sayers,* Del.Supr., 482 A.2d 744 (1984). The theory is that actual part performance of an oral agreement constitutes substantial evidence of that agreement. *Durand v. Snedeker,* Del. Ch., 177 A.2d 649 (1962).

Aubrey asserts AIG's performance conformed with the terms of the Agreement when it accepted premiums in accordance with the commission structure set forth in the Agreement. To support its assertion, Aubrey points to Pagano's testimony on direct examination:

Q: Did AIG accept premium dollars in West Virginia and Florida throughout 1994?

A: Yes, I believe so.

Q: And at least for the second half of 1994, would those premiums have been accepted in accordance with the compensation structure outlined in the Agreement?

A: I believe they were.

Pagano's next response, however, clarifies his prior statement.

Q: At least with respect to the premium dollars in West Virginia and Florida, what compensation structure was used for those premium dollars?

A: I believe it was the same compensation that I outlined for Aubrey in previous memos.

Q: What about the Agreement?

A: I don't know. I believe it was the same kind of structure that was outlined in the Agreement.

*See* D.I. 136, Exh. E at 76/3.

■ The parties had an ongoing business relationship that encompassed a number of states, including West Virginia and Florida. Aubrey began remitting premiums from accounts in West Virginia in 1993 and AIG accepted these premiums, all in accordance with an oral understanding the parties had reached. This understanding was confirmed in a Pagano memorandum to Rogers dated July 30, 1993, which outlined AIG would accept premiums with a commission structure of 57% for credit life insurance. D.I. 130 at A166. Aubrey did, thereafter, receive a 57% commission pay out on its West Virginia credit life insurance business. This commission structure for credit life insurance is the same as the one outlined in the October 3, 1994, Agreement. AIG's acceptance of premiums with a commission structure of 57% for credit life insurance is as consistent with its previous oral understanding with Aubrey, as it is under the Agreement. The act of part performance, however, must be one that AIG and Aubrey would not have done except for the alleged written contractual obligation. *See Chaplake Holdings, Ltd. v. Chrysler Corp.,* 1999 WL 167834 (Del.Super., Jan. 13, 1999); *Durand,* 177 A.2d at 653; *Marta v. Mutual Life Ins. Co. of New York,* 887 F.Supp. 722, 726 (D.Del.1995). The Court, therefore, holds that Aubrey has not satisfied the part performance exception to the Statute of Frauds. The Agreement violates the Delaware Statute of Frauds and is therefore unenforceable. 6 Del.C. § 2714(a).

### B. Tortious Interference With Aubrey's Contractual And Business Relationships

Aubrey claims that AIG tortiously interfered with its existing and prospective contractual and business relationships by

failing to provide monthly profit/loss information and other underwriting assistance, failing to provide [its] accounts with adequate supplies, reducing commission rates while not giving it enough time to notify it's [sic] accounts, terminating the contract after only six months and severely damaged Plaintiff's credibility in the industry and compromised it's [sic] relationship with existing and prospective sub-agents and accounts.

 Under Delaware law, in order to state a claim for tortious interference with a contract, the plaintiff must allege that the defendant induced a third party to breach its contract with the plaintiff. *See Stoltz v. Delaware Real Estate Commission*, 473 A.2d 1258, 1264 (Del.Super.1984) (in the context of inducement to breach contract, inducement means to cause a party to choose one course of action rather than another). Aubrey has not alleged, much less proven, that AIG induced any subagent or account to break its contract with Aubrey. Therefore, it cannot be said AIG tortiously interfered with any of the contractual agreements that Aubrey had with its subagents or accounts.

Aubrey also argues that AIG by terminating the Agreement tortiously interfered with Aubrey's existing and prospective business relations with its subagents and accounts. Aubrey asserts AIG's termination of the Agreement caused the subagents and accounts not to renew their existing business relationships with it. As the Court has held the Agreement to be unenforceable because it violates the Delaware Statute of Frauds, there can be no claim of tortious interference that arises from termination of such an Agreement. The Court, therefore, holds that AIG has not tortiously interfered with the contractual and business relationships which Aubrey had with its subagent and accounts.

## C. Oral Agreement To Provide Aubrey With Monthly Experience Reports

In July 1993, Pagano, Ellen Conic ("Conic"), and Capone had a meeting with Rogers. Pagano and Conic, in their depositions, testified that AIG at the July 1993 meeting agreed to provide Aubrey with monthly experience reports. Pagano on being questioned by Aubrey's counsel testified:

Q: Mr. Pagano, at this July 1993 meeting, did AIG agree to produce those items to Mr. Rogers?

A: Yes.

Q: And would those include number two that's marked as profit and loss statements?

A: Yes.

Q: Are those the same thing that we referred to earlier as experience reports?

A: Yes

*See* D.I. 136; Exh. E at 27/21–28/4.

AIG failed to provide Aubrey with monthly experience reports from July 1993 onwards, with the sole exception of a July 1994 experience report, which it sent to Rogers in September 1994. AIG by failing to provide Aubrey with monthly experience reports breached the oral promise it had made to Aubrey in July 1993, and reaffirmed in May 1994.[3]

## D. Aubrey's Claim of Fraud and Negligent Misrepresentation

Aubrey asserts AIG either fraudulently or negligently misrepresented that it would (i) provide Aubrey with monthly experience reports; and (ii) aggressively seek from West Virginia a rate deviation on the disability policies. Both parties have filed cross motions for summary

---

**3.** The oral agreement to provide Aubrey with monthly experience reports both predates and is not addressed by the Agreement. Consequently, there is no agreement between the parties, which requires AIG to provide Aubrey with experience reports over a period of three years. This being the case, the oral agreement to provide experience reports is capable of being performed in a year and is, therefore, not subject to the Delaware Statute of Frauds.

judgment on Aubrey's claim of fraud and negligent misrepresentation.

In order to prevail on a claim of fraud and negligent misrepresentation, the plaintiff has to show: (i) false representation; (ii) of a material fact; (iii) defendant's knowledge of the falsity of the statement or defendant's making of the statement with reckless disregard for or indifference to its truth;[4] (iv) plaintiff's belief in the truth of the statement and the justifiable reliance thereon; and (v) damage to the plaintiff as a result of such reliance. *Brzoska v. Olson,* 668 A.2d 1355, 1366 (Del.1995); *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 624 A.2d 1199, 1208 n. 17 (Del. 1993).

### 1. Experience Reports

Aubrey asserts it entered into an oral agreement to sell credit life insurance underwritten by AIG because it was promised monthly experience reports. Aubrey further alleges that AIG had no intention of producing these reports when it made the promise, because it had a company policy that barred dissemination of this information to agents such as Aubrey. To support its allegations Aubrey points to testimony of Capone, vice president for AIG's credit life insurance business. Capone testified AIG had a policy of not disseminating experience reports to agents. He further stated "[I]f I were aware of AIG agreeing to provide these documents, I would have objected at that point." D.I. 136; Exh. N at 123/19—124/14. Both Pagano and Conic, however, testified in their depositions that Capone was present at both the July 1993 meeting when AIG promised to provide Aubrey with the experience reports, as well as at the May 1994 meeting when AIG reaffirmed its commitment to provide Aubrey with the experience reports. D.I. 132; Exh. A at 22/18–22; 55/20–23. Aubrey asserts

AIG's failure to provide monthly experience reports, with the sole exception of the July 1994 experience report, lends credence to its allegations of fraud and negligent misrepresentation by AIG.

AIG, on the other hand, argues there is no evidence that AIG intended to deceive Aubrey because (i) it provided Aubrey with the July 1994 experience report; (ii) neither Pagano nor Conic, the AIG officials responsible for sending the experience reports, were aware of the company "policy"; and (iii) Capone did not communicate the company "policy" to Pagano or Conic or in any way hinder them from providing Aubrey with the monthly experience reports. *See* D.I. 135 at B 62–63.

AIG's motion for partial summary judgment will be denied as there exists a material issue of fact as to whether AIG defrauded Aubrey when it promised monthly experience reports and then failed to provide them.

The Court will also deny Aubrey's motion for partial summary judgment because there exists a material issue of fact as to whether Aubrey was induced to sell credit life insurance underwritten by AIG by AIG's promise to provide monthly experience reports. Aubrey asserts it would not have entered into a business relationship to sell credit life insurance for AIG, but for AIG's promise to provide it with monthly experience reports. In support of its position, Aubrey points to the testimony of Conic, AIG's credit life insurance manager. Conic on being questioned by Aubrey's counsel testified:

Q: What did Mr. Rogers require in order for this deal with AIG to work?

A: It would have included loss ratio information.

Q: Were you aware of that requirement?

A: Yes.

---

**4.** For negligent misrepresentation, the plaintiff need not demonstrate the misrepresentation was made knowingly or recklessly. *Zirn*

*v. VLI Corp.,* 681 A.2d 1050, 1061 (Del.1996). The other elements of this tort, however, are identical to the elements for fraud.

Q: Was Mr. Pagano aware of that requirement?

A: Yes.

Q: Was Mr. Capone aware of that requirement?

A: Yes.

*See* D.I. 136; Exh. F at 28/17—29/8.

AIG, on the other hand, argues that it did not induce Aubrey to enter into a business relationship with it by promising to provide monthly experience reports. AIG asserts it had an ongoing business relationship with Aubrey, which included Aubrey selling its credit life insurance policies, that predated its promise to provide monthly experience reports at the July 1993 meeting. Moreover, AIG argues, if obtaining the monthly experience reports was that important to Aubrey, why did it not (i) submit a single written complaint to AIG regarding the failure to provide experience reports, and (ii) insert a provision in the revised Agreement it sent to AIG, which would have required AIG to provide it with experience reports.

### 2. Applying For A Deviation

Aubrey claims AIG either fraudulently or negligently misrepresented that it would aggressively seek from West Virginia a rate deviation on the disability policies when it had no intention to do so. The record does not support Aubrey's allegations. AIG did file for a rate deviation but its application was turned down by the West Virginia insurance department. At his deposition Rogers confirmed AIG had been rebuffed in its attempt to secure a rate deviation from West Virginia. In fact, Rogers personally talked to the West Virginia insurance department when AIG's application for rate deviation was turned down and was told that "West Virginia had declared a moratorium on deviations . . . and was not giving out any deviations." D.I. 130 at A–29.

The testimony makes clear that AIG had no intention of deceiving Aubrey. It attempted to secure a deviation but was unsuccessful. The Court will grant AIG's motion for summary judgment on this issue.

## V. CONCLUSION

For the reasons stated above, the only claims that survive the parties' cross motions for partial summary judgment are: (i) AIG's breach of an oral agreement to provide Aubrey with monthly experience reports; and (ii) Aubrey's assertion that AIG committed fraud or made a negligent misrepresentation when it promised to provide monthly experience reports and then failed to do so.

An order will be entered.